**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| PEDRO RAMOS, | : | CIVIL NO. 4:10-CV- 681 |
| | : | |
| Petitioner, | : | (Judge McClure) |
| v. | : | |
| | : | (Magistrate Judge Carlson) |
| RONNIE HOLT, et al., | : | |
| | : | |
| Respondents. | : | |

## REPORT AND RECOMMENDATION

### I.    Introduction

This Habeas Corpus Petition calls upon the Court to answer two questions regarding the application of the Second Chance Act, a 2008 federal statute designed to provide prison officials with greater discretion in assisting inmates in making the transition back into society by permitting prison officials to place inmates in Residential Re-entry Centers up to 12 months before they are released from custody.

First, we must determine whether a federal inmate who wishes to bring a habeas corpus petition based upon an alleged failure by prison staff to comply with the Act must first exhaust administrative remedies within the prison system. For the reasons set forth below, we conclude that exhaustion of these administrative remedies is a prerequisite to federal habeas corpus relief in this setting. However, we also find that

Ramos effectively exhausted his administrative remedies by appealing this decision denying him early placement in a Residential Re-entry Center through the Bureau of Prisons grievance system, and that the Bureau of Prisons should not preclude consideration of his claims on their merits simply by asserting that Ramos' numerous grievances were in some respects procedurally flawed.

Second, this Petition invites us to determine whether, and to what extent, the Second Chance Act gives federal inmates a substantive right to early release to a halfway house or other non-custodial setting as they near the conclusion of their prison terms. With respect to this question, we find, consistent with the vast majority of courts, that the Act does not create a specifically enforceable right to release at any particular time. Rather, it provides guidance to prison officials in the exercise of their longstanding statutory discretion concerning inmate placements, guidance that permits, but does not compel, earlier release to a residential setting for inmates. Accordingly, what the law requires is for prison staff to give each inmate individualized consideration for earlier residential release, but leaves that individualized assessment largely in the discretion of corrections staff. Thus, we find that the requirements of the Act are fully met where, as in this case, the evidence shows that the Petitioner received a carefully tailored and individualized assessment of his suitability for placement in a Residential Re-entry Center.

## II.    Statement of Facts and of the Case

### A.    Pedro Ramos

Pedro Ramos is a 38 year-old federal inmate, who was sentenced in 2004 to 100 months incarceration for conspiracy to distribute and possession with intent to deliver at least 100 grams of heroin. (Doc. 5, Declaration of Serena Gonzalez Ex. 1 ¶ 3.) Ramos has been incarcerated at the United States Penitentiary, Canaan since May 28, 2008, (Id. ¶ 4) and is currently scheduled for release on April 9, 2011. (Id.) Ramos has prior drug, robbery and firearms convictions, and a prior history of drug use. (Id., Ex. 1, Attach. 6.) While incarcerated, it appears that Ramos has generally maintained clear institutional conduct without any significant infractions. (Id., Ex. 1, Attach. 6.)

### B.    The Second Chance Act and BOP Implementing Guidance

While Ramos was serving this federal sentence, in April of 2008, the Second Chance Act of 2007, Pub. L. No. 110-199, went into effect. This act contains several provisions which are designed to aid prisoners in their transition back into society. For example, the Act authorizes the Bureau of Prisons to place certain inmates in Residential Re-entry Centers (RRC) for as much as one year at the end of their prison terms to aid them in their readjustment into society. See 18 U.S.C. § 3624(c)(1).[1]

---

[1] 18 U.S.C. § 3624(c) provides as follows:

**( c ) Prerelease custody.**–

While Ramos has been in federal custody the Bureau of Prisons has adopted a series of policies, practices and procedures which govern inmate placement and custody. (Doc. 5, Ex.1, Attach. 1-6.)  These policies, in part, speak to the issue of  Residential Re-entry Centers (RRC) placements of inmates in the year prior to their release dates.

These prison policies, which are attached to the response to this Petition, specifically directed that as a result of the Second Chance Act: (1) RRC placements were increased to a maximum of twelve months; (2) RRC placement determinations

---

**(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

**(2) Home confinement authority.**--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months.

**(3) Assistance.**--The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during prerelease custody under this subsection.

**(4) No limitations.**--Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621

18 U.S.C. § 3624 (c).

are to be made on an individualized basis using the criteria set forth at 18 U.S.C. §3621(b); and, (3) sentencing court orders, recommendations or requests directing an inmate's placement in an RRC were not binding on the Bureau of Prisons.

The Bureau of Prisons policies governing implementation of the Act further specifically instructed prison staff that all "inmates must now be reviewed for pre-release RRC placements 17-19 months before their projected release dates," and the memorandum sets forth the five factors under 18 U.S.C. § 3621(b) which must be considered when determining RRC placement dates. (Id.) With respect to these factors, the memorandum stated, "the Act requires staff to ensure that each pre-release RRC placement decision is 'of sufficient duration to provide the greatest likelihood of successful reintegration into the community.'" (Id.)

Thus, staff were admonished that they "must approach every individual inmate's assessment with the understanding that he/she is now eligible for a maximum of 12 months pre-release RRC placement." (Id., emphasis in original.) The guidance provided to prison staff further states as follows: "While the Act makes inmates eligible for a maximum of 12 months pre-release RRC placements, Bureau experience reflects inmates' pre-release RRC needs can usually be accommodated by a placement of six months or less. Should staff determine an inmate's pre-release RRC placement may require greater than six months, the Warden must obtain the Regional Director's

written concurrence before submitting the placement to the Community Corrections Manager." (Id.) Therefore, the Bureau of Prisons policy guidance implementing the Act accomplishes three goals: First, it mandates consideration of 12- month residential re-entry center programs for all inmates. Second, while mandating this individualized consideration, the policy notes that for many prisoners "inmates' pre-release RRC needs can usually be accommodated by a placement of six months or less." Therefore, the policy contains a third critical component requiring Regional Director approval for RRC placements exceeding 6 months.

## C. Application of The Second Chance Act and Implementing Guidance to Ramos' RRC Placement

It is against this statutory regulatory and administrative background that prison officials considered an RRC placement for Pedro Ramos. That consideration extended through the spring, summer and fall of 2009. As part of this process, on April 28, 2009, a Program Review was held for Ramos. (Id. Ex. 1, Attach. 6.) This review was reflected in an inmate skills development plan, which thoroughly and individually documented Ramos' criminal history, institutional conduct, social development, training programs, social history and family background. (Id.) This Program review then formed the basis for an RRC placement decision for Ramos.

On July 30, 2009, Ramos began inquiring into his RRC placement, submitting an inmate request to staff inquiring about his RRC placement.( Id. ¶ 7; Inmate Request to Staff, Attach. 3.) On August 2. 2009, Ramos was informed that he would be considered for a RRC placement individual to his needs. (Id.) On November 4, 2009, Ramos submitted another inmate request to staff inquiring about his RRC placement. (Id. ¶ 8; Inmate Request to Staff, Attach. 4.) In response to this second request, Ramos was informed that he would be recommended for a RRC placement of 150 to 180 days based on the length of his sentence, program participation, institutional conduct, family and community ties, release residency, medical issues, and bed space availability at the RRC. (Id.; see Institutional Referral for CCC Placement, Attach. 5 to Ex. 1).

On January 29, 2010, a recommendation for 150 to180 days RRC placement was submitted for the Warden's approval. (Id. ¶ 9; Inmate Skills Development Plan, Attach. 6). The recommended time frame was based on the five statutory factors contained in 18 U.S.C. § 3621, and reflected that these five factors had been applied specifically to the personal circumstances presented in Ramos' case, since the notification referred to Ramos' personal history, past drug use, and current family situation. (Id.; Institutional Referral for CCC Placement, Attach. 5 to Ex. 1). In particular, this recommendation was based on the fact that Ramos has secured

residency with his wife, that Ramos was not destitute, that Ramos had a GED, and had employment skills as well as fluency in two languages. (Id.; Inmate Skills Development Plan, Attach. 6). The RRC placement decision also set individually tailored goals for Ramos, stating that Ramos's primary objectives while housed at the RRC should be the need to secure employment and to reconnect with his family.( Id. ¶ 10; Inmate Skills Development Plan, Attach. 6). Ramos currently has an RRC placement date of October 12, 2010, at the Brooklyn House in Brooklyn, New York. (Id.)

D.    **Bureau of Prisons Grievance Procedures and Ramos' Administrative Efforts To Challenge This RRC Placement Decision**

With respect to inmate concerns regarding RRC placements and other matters, the Bureau of Prisons has adopted a three-tiered administrative remedy procedure with respect to inmate complaints which is set forth at 28 C.F.R. § 542.10, et seq. As part of this grievance process, inmates should first present their complaints to staff, and staff are obliged to attempt to informally resolve any issues before an inmate files a formal request for Administrative Remedy. Id. at § 542.13(a). At the second stage of this process, if an inmate is unable to informally resolve his complaint, the inmate may file a formal written complaint to the Warden, on the appropriate form within twenty (20) calendar days of the date on which the events which form  the basis for the

complaint took place. Id. at § 542.14(a). If the inmate's concern is not addressed to the inmate's satisfaction by the Warden's response, the inmate may then file an appeal to the Regional Director within 20 calendar days. Id. at § 542.15(a). Finally, if the inmate is dissatisfied with the Regional Director's response, that decision may then be appealed to the General Counsel (Central Office) within 30 calendar days from the date of the Regional Director's response. Id. The Regional Director then has 30 calendar days to respond and the General Counsel has 40 calendar days to address the inmate's concern. Id. at § 542.18.

As these regulations state: "The purpose of the Administrative Remedy Program is to allow an inmate to seek formal review of an issue relating to any aspect of his/her own imprisonment." 28 C.F.R. § 542.10(a). Under this grievance process: "If an inmate raises an issue in a request or appeal that cannot be resolved through the Administrative Remedy Program, the Bureau will refer the inmate to the appropriate statutorily-mandated procedures." Id. at § 542.10(c). Furthermore, under these procedures, no administrative remedy appeal is considered to have been fully exhausted until decided by the Central Office. 28 C.F.R. § 542, et seq.

Notified of this proposed RRC placement by prison officials in November of 2009, Ramos attempted in a diligent, if procedurally flawed fashion, to challenge this prison placement decision through the institutional grievance system. First, on

November 20, 2009, Ramos filed an administrative remedy at the institution level requesting 12-months RRC placement.(Id., Declaration of Susan Albert Ex.2 ¶ 5; BOP SENTRY Report, Administrative Remedy Generalized Retrieval, Attach. 1 p. 2.) On November 30, 2009, this remedy was rejected, not on a consideration of its merits, but for procedural errors. (Id.) Undeterred Ramos, tried again on December 4, 2009, re-filing his institution remedy request. (Id.) This request was denied and closed on December 21, 2009.( Id.)

Ramos then attempted to further exhaust his institutional remedies on December 28, 2009, when he appealed the Warden's response and filed administrative remedy at the Regional Office level. (Id. ¶ 6; BOP SENTRY Report, Administrative Remedy Generalized Retrieval, Attach. 1 p. 3.) This effort was also unavailing, as this appeal was denied and closed on January 26, 2010. (Id.) Ramos, however, continued to persist in his efforts to pursue administrative relief. On February 24, 2010, Ramos appealed the Regional Director's response by filing an administrative remedy with the Bureau of Prisons Central Office. (Id. ¶ 7.) On March 30, 2010, this administrative remedy was rejected because Ramos failed to provide a copy of his informal request with his appeal.(Id.) Ramos was advised he could resubmit his appeal in proper format within 15 days, or by April 14, 2010. ( Id.)  By adopting this approach to Ramos'

appeal, which emphasized clerical requirements, the Bureau of Prisons Central Office never addressed the merits of his complaints regarding his RRC placement.

### E. Ramos' Habeas Petition

On March 29, 2010, Ramos filed this Petition for Writ of Habeas Corpus. (Doc. 1.) In his Petition Ramos challenges the prison's decision to deny him 12-month early release consideration under the Second Chance Act, arguing that the actions of prison personnel are arbitrary and inconsistent with the law. These issues have been fully briefed by the parties (Docs. 1 and 5) and are now ripe for disposition. For the reasons set forth below, it is recommended that the Court find that Ramos has effectively exhausted his administrative remedies, but deny this Petition because the Petition fails on its merits.

### III. Discussion

#### A. The Exhaustion Doctrine Does Not Bar Consideration of This Habeas Petition.

At the outset in this case, Respondents invite us to treat this Petition in the same way that the Bureau of Prisons Central Office treated Ramos' administrative appeal; that is, deny the Petition on procedural grounds without fully speaking to the merits of this request. Specifically, the Respondents invite us to deny this Petition based upon Ramos' alleged failure to exhaust his administrative remedies. Respondents advance

this argument, even though they concede that Ramos  followed the full administrative appeal procedure prescribed by the Bureau of Prisons. Moreover, Respondents urge us to take this position even though these administrative grievances  were ultimately rebuffed because of perceived procedural flaws.

In the unique circumstances presented here, it is recommended that the Court should decline this invitation. Although 28 U.S.C. § 2241 contains no express exhaustion requirement, "[o]rdinarily, federal prisoners are required to exhaust their administrative remedies prior to seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2241." Gambino v. Morris, 134 F.3d 156, 171 (3d Cir.1998); see also, e.g., Callwood v. Enos, 230 F.3d 627, 634 (3d Cir.2000); Bradshaw v. Carlson, 682 F.2d 1050, 1052 (3d Cir.1981). These exhaustion rules serve an important and salutary purpose. The United States Court of Appeals for the Third Circuit requires administrative exhaustion of a claim raised under § 2241 for three reasons:  "(1) allowing the appropriate agency to develop a factual record and apply its expertise facilitates judicial review; (2) permitting agencies to grant the relief requested conserves judicial resources; and, (3) providing agencies the opportunity to correct their own errors fosters administrative autonomy." Moscato v. Federal Bureau of Prisons, 98 F.3d 757, 761-62 (3d Cir.1996); see also Gambino, 134 F.3d at 171; Lyons v. U.S. Marshals, 840 F.2d 202, 205 (3d Cir.1988).

In this case, it is undisputed that Ramos pursued administrative appeals throughout the Bureau of Prisons system, seeking re-consideration of this placement decision from the warden, the regional director, and the Bureau of Prisons Central Office. Those grievances have been uniformly denied, with the Central Office electing to rest its decision to deny relief essentially upon his alleged procedural errors.

With respect to habeas petitions which challenge the denial of RRC placements under the Second Chance Act: "Courts in the Middle District of Pennsylvania have consistently held that 'exhaustion of administrative remedies is not rendered futile simply because a prisoner anticipates he will be unsuccessful in his administrative appeals before the twelve-month pre-release mark, which is simply a statutory maximum and not a mandate.' " Ross v. Martinez, No. 09-1770, 2009 WL 4573686, 3 (M.D.Pa. Dec. 1, 2009)(citations omitted). Rigorously applying these exhaustion requirements, this Court has in the past consistently rejected habeas petitions brought under the Second Chance Act where inmates have failed to fully exhaust their administrative remedies. See, e.g., Lacy-Thompson v. Martinez, No. 09-1320, 2009 WL 4823875 (M.D. Pa. Dec. 14, 2009); Ferris v. Holt, No. 09-1465, 2009 WL 3260557 (M.D. Pa. Oct. 8, 2009); Drummond v. Martinez, No. 09-1258, 2009 WL 3241851 (M.D. Pa. Oct. 5, 2009).

While we agree that administrative exhaustion is a prerequisite to seeking habeas relief challenging some aspect of prison discretion in a Residential Re-entry Center placement under the Second Chance Act, these cases which have denied habeas relief to a prisoner on exhaustion grounds have consistently involved instances in which the inmate failed to complete the three-step grievance process prescribed by the Bureau of Prison. Id. In contrast, in this case Ramos completed that process, appealing both to the regional director and to the Bureau of Prisons Central Office. The Central Office, however, elected to reject his appeal on procedural grounds . Thus, the Bureau of Prisons Central Office rejected these grievances without reaching the merits of Ramos' concerns.

In such a situation, where the inmate has acted in good faith and has completed all steps of the grievance process, we believe that the agency's decision to deny his appeal on procedural grounds should not serve as a bar to the inmate's access to federal court. Given Ramos' efforts to present this issue, the Bureau of Prison could easily have responded to the merits of his request, while also addressing these procedural aspects of his appeal. Had the Bureau of Prisons accepted any of these invitations to consider the merits of his claims, the goals of exhaustion would have been fully met here. In such an instance, the agency's consideration of this appeal on its merits would have: "(1) allow[ed] the . . . agency to develop a factual record and

apply its expertise facilitat[ing] judicial review; (2) permitt[ed] [the] agenc[y] to grant the relief requested [thus] conserv[ing] judicial resources; and, (3) provid[ed] [the] agenc[y] the opportunity to correct their own errors [thereby] foster[ing] administrative autonomy." Moscato v. Federal Bureau of Prisons, 98 F.3d at 761-62. Instead, by choosing to deny the request based upon purported procedural failures the Bureau of Prisons forfeited the opportunity to use this process to secure all of the benefits of administrative exhaustion. Having decided to forego the benefits of exhaustion in terms of allowing the agency to consider the merits of an inmate request, it would be anomalous to allow the agency to now assert the exhaustion doctrine as a bar to merits consideration of this Petition in federal court when it is clear that Ramos attempted to fully exhaustion his remedies.

Moreover, adopting the exhaustion requirement in a fashion which ties access to federal court to an inmate's failure to meet agency procedural benchmarks in an administrative appeal conflicts with the standards which govern the exhaustion doctrine generally in habeas petitions. Indeed, in many instances federal law permits the Court in its discretion to reach the merits of claims that may arguably be procedurally flawed. For example, 28 U.S.C. § 2254(b)(2), expressly authorizes the Court in some instances to address the merits of a procedurally flawed claim stating:

"An application for writ of habeas corpus may be denied on the merits, notwithstanding the [alleged] failure of the applicant to exhaust [other] remedies...."

Federal habeas corpus case law also recognizes that, while this exhaustion rule compels petitioners to permit another court or agency a fair "opportunity to apply controlling legal principles to the facts bearing upon [the petitioner's] constitutional claim," Picard v. Connor, 404 U.S. 270, 276 (1971), this requirement should be applied in a commonsense fashion. Thus, as a general rule, the exhaustion requirement is met when a petitioner submits the gist of his federal complaint to a court or agency for consideration, without the necessity that the petitioner engage in some "talismanic" recitation of specific constitutional claims. Evans, 959 F.2d at 1230-33. Similarly, a petitioner meets his obligations by fairly presenting a claim, even if the court or agency declines to specifically address that claim. See Dye v. Hofbauer, 546 U.S. 1(2005) (per curiam); Johnson v. Pinchak, 392 F.3d 551, 556 (3d Cir. 2004).

Adopting this practical and commonsense view of the exhaustion requirement we find that Ramos effectively exhausted his remedies by pursuing appeals to the warden, the regional director and the Central Office. We decline the invitation of the Bureau of Prisons to condition Ramos' access to the courts upon the agency's assessment of the procedural adequacy of these appeals to the Central Office. Instead, we find that Ramos exhausted his administrative remedies by completing all three

steps of the Bureau of Prisons administrative appeal process even if the merits of his claim were not considered by that agency in its final agency decision. See Wires v. Bledsoe, No. 09-2247, 2010 427769, *3, n.1 (M.D.Pa. Feb. 3, 2010); Strong v. Schultz, 599 F.Supp.2d 556, 561 (D.N.J. 2009).

### B. This Petition Fails on Its Merits

Although we find that the exhaustion doctrine should not, in this case, prevent consideration of the merits of Ramos' Petition for Writ of Habeas Corpus, we conclude that Ramos has not carried his burden of establishing that this discretionary decision by the Bureau of Prisons violated any rights guaranteed to him by the Constitution or laws of the United States. Therefore, we recommend that this Petition be denied on its merits.

At the outset, it is clear that this Petition does not raise any concerns of a Constitutional dimension. Nor can Ramos rely upon Constitutional concerns to challenge this RRC placement decision since it is well established that the United States Constitution does not confer any right upon an inmate to any particular custody or security classification. Moody v. Daggett, 429 U.S. 78, 88 (1976); Montanye v. Haymes, 427 U.S. 236, 242 (1976). Thus, inmates do not have a liberty interest in retaining or receiving any particular security or custody status "[a]s long as the

[challenged] conditions or degree of confinement is within the sentence imposed ... and is not otherwise violative of the Constitution." Id.

Similarly, it has long been recognized that the mere fact of a prison transfer, standing alone, does not constitute cruel and unusual punishment in violation of the Eighth Amendment to the Constitution. See, e.g., Hassain v. Johnson, 790 F.2d 1420 (9th Cir. 1986); Serrano v. Torres, 764 F.2d 47 (1st Cir. 1985). Thus, even inmate transfers to facilities far from their homes do not rise to the level of cruel and unusual punishment. See, e.g., Gov't of Virgin Island v. Gereau, 592 F.2d 192 (3d Cir. 1979)(transfer from Virgin Islands to mainland); Rodriguez-Sandoval v. United States, 409 F.2d 529 (1st Cir. 1969)(transfer from Puerto Rico to Atlanta). In short, well-settled law establishes that prisoners have no inherent constitutional right to placement in any particular prison, such as a Residential Re-entry Center, to any security classification, or to any particular housing assignment. See Olim v. Wakinekona, 461 U.S. 238, 245 (1983); Meachum v. Fano, 427 U.S. 215 225 (1976); Montanye, 427 U.S. at 242; Bulger v. U.S. Bureau of Prisons, 65 F.3d 48 (5th Cir. 1995); Marchesani v. McCune, 531 F.2d 459 (10th Cir.1976).

Rather, Ramos' sole avenue for substantive relief lies through the Second Chance Act itself. With respect to habeas claims premised on the Act, as we have noted, in April of 2008, the Second Chance Act of 2007, Pub. L. No. 110-199, went

into effect. This Act contains several provisions which are designed to aid prisoners in their transition back into society. For example, the Act authorizes the Bureau of Prisons to place certain inmates in Residential Re-entry Centers for up to one year at the end of their prison terms to aid their readjustment into society. <u>See</u> 18 U.S.C. § 3624(c)(1).[2]

---

[2]18 U.S.C. § 3624(c) provides as follows:

**( c ) Prerelease custody.**–

**(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions may include a community correctional facility.

**(2) Home confinement authority.**--The authority under this subsection may be used to place a prisoner in home confinement for the shorter of 10 percent of the term of imprisonment of that prisoner or 6 months.

**(3) Assistance.**--The United States Probation System shall, to the extent practicable, offer assistance to a prisoner during prerelease custody under this subsection.

**(4) No limitations.**--Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621

18 U.S.C. § 3624(c).

While the Act promotes policies assisting inmates in reintegration into society, nothing in the Act is mandatory, and the Act does not compel the Bureau of Prisons to provide particular inmates with a specific community confinement or home detention placement. Quite the contrary, the statutory text makes it clear that prison officials retain their broad discretion in placing, housing, transferring and classifying inmates.  Thus, 18 U.S.C. § 3624(c)(4) clearly states that the Act in no way restricts the broad discretion conferred upon the Bureau of Prisons under 18 U.S.C. § 3621 to make decisions on how best to house inmates, providing that: "Nothing in this subsection shall be construed to limit or restrict the authority of the Director of the Bureau of Prisons under section 3621". Section 3621, in turn,  reaffirms the discretion of prison officials in this field to make appropriate prison placement decisions based upon five statutory factors set forth in 18 U.S.C. § 3621(b). [3]  Similarly, while the

_____

[3]18 U.S.C. § 3621(b) provides:

(b) Place of imprisonment.--The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering-

(1) the resources of the facility contemplated;
(2) the nature and circumstances of the offense;
(3) the history and characteristics of the prisoner;
(4) any statement by the court that imposed the sentence--

Second Chance Act amended 42 U.S.C. § 17541 to encourage the Bureau of Prisons to examine early release and social re-integration for certain offenders, the Act expressly reaffirms that decisions relating to which offenders may qualify for the program involve assessments that rest in the sound discretion of the Bureau of Prisons. See 42 U.S.C. §§ 17541(a)(2) and (g)(5).

Indeed, as it relates to inmate community confinement decisions, the Second Chance Act speaks directly to the discretion retained by the Bureau of Prisons in 18 U.S.C. § 3624(c)(1) which provides as follows:

> **( c ) Prerelease custody.–**
>
> **(1) In general.**--The Director of the Bureau of Prisons shall, to the extent practicable, ensure that a prisoner serving a term of imprisonment spends a portion of the final months of that term (not to exceed 12 months), under conditions that will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that prisoner into the community. Such conditions <u>may</u> include a community correctional facility.

---

(A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
(B) recommending a type of penal or correctional facility as appropriate; and
(5) any pertinent policy statement issued by the Sentencing Commission pursuant to Section 994(a)(2) of title 28 . . . Any order, recommendation, or request by a sentencing court that a convicted person serve a term of imprisonment in a community corrections facility shall have no binding effect on the authority of the Bureau under this section to determine or change the place of imprisonment of that person.

18 U.S.C. § 3624(c)(1)(emphasis added).

The use of the word "may" in § 3624 (c), has led many courts to hold that the Act creates no absolute, enforceable legal right to a 12- month RRC placement for any prisoner. See, e.g., O'Hara v. Rios, No. 08-5160, 2009 U.S. Dist. LEXIS 90243 (D. Minn. Sept. 28, 2009); McGee v. Thomas, No. 09-455, 2009 U.S. Dist. LEXIS 62617 (D. Ore. July 22, 2009). Rather, what is required by the Act is a showing that the Bureau of Prisons engaged in an individualized determination of each inmate's RRC placement, using the statutory factors set forth in the law. Smith v. Sanders, No. 09-3083, 2009 U.S. Dist. LEXIS 82265 (C.D. Cal. July 31, 2009).

Moreover, in considering whether the Bureau of Prisons has properly exercised its broad discretion in this field, over the past year courts have frequently examined the Bureau of Prisons policy statements implementing the Act. These policies statements: (1) note that many inmates can be successfully re-integrated into society in 180 days or less: and, (2) require regional director approval for 12-month RCC placements. Much recent litigation in this field has focused on the issue of whether this policy guidance violates the Second Chance Act by creating unwarranted institutional and bureaucratic obstacles to such 12-month placements. As to this issue, courts are divided.

The majority view, reflected in numerous trial court opinions, and in the only appellate court decision to have considered this issue, holds that the Bureau of Prisons' requirement of regional director approval, and the agency's stated view that many inmates can have their needs meet through 180-day RRC placements, do not violate the Act[4]. This view has twice been adopted by courts in this district. McDonald v. Obama, No. 10-379, 2010 WL 1526447 (M.D. Pa. April 15, 2010), adopting, McDonald v. Obama, No. 10-379, 2010 WL 1526443 (M.D. Pa. March 15, 2010); Wires v. Bledsoe, No. 09-2247, 2010 WL 427769 (M.D.Pa. Feb. 3, 2010)(citing Torres v. Martinez, No. 09-CV-1070 (M.D.Pa. Aug.12, 2009))(Munley, J.)

Recognizing the broad discretion expressly conferred to the Bureau of Prisons by statute, these cases consistently hold that the requirement of regional director

---

[4]See,e.g., Miller v. Whitehead, 527 F.3d 752,755-58 (8th Cir. 2008); Wires v. Bledsoe, No. 09-2247, 2010 WL 427769 (M.D.Pa. Feb. 3, 2010)(citing Torres v. Martinez, No. 09-CV-1070 (M.D.Pa. Aug.12, 2009)); Fleischi v. Outlaw, No. 09-79, 2009 U.S.Dist. LEXIS 99306 (E.D. Ark. Oct. 26, 2009); O'Hara v. Rios, No. 08-5160, 2009 U.S. Dist. LEXIS 90243 (D. Minn. Sept. 28, 2009); Holland v. Bureau of Prisons, No. 08-3960, 2009 WL 2872835 (D.S.C. Sept. 2, 2009); Smith v. Sanders, No. 09-3083, 2009 U.S. Dist. LEXIS 82265 (C.D. Cal. July 31, 2009); Yanucci v. Stansberry, No. 08-561, 2009 WL 2421546 (E.D.Va. July 28, 2009); McGee v. Thomas, No. 09-455, 2009 U.S. Dist. LEXIS 62617 (D. Ore. July 22, 2009); Sessel v. Outlaw, No. 08-212, 2009 WL 1850331 (E.D. Ark. June 25, 2009); Stanko v. Rios, No. 08-4991, 2009 WL 1303969 (D. Minn. May 8, 2009); Somerville v. DeWalt, No. 09-68, 2009 U.S.Dist. LEXIS 37454 (E.D. Ky. May 1, 2009); Snyder v. Angelini, No. 07-3073, 2008 U.S. Dist. LEXIS 86460 (E.D.N.Y. Oct. 27, 2008).

approval for 12-month RRC placements, and the various agency statements expressing an institutional view that RRC placements of 6 months or less are generally adequate for most inmates, do not violate the Act. Rather these policies simply reflect the Bureau of Prisons' exercise of its discretion in implementing the Act, an Act which provides that prison officials simply "may" use community corrections facilities for up to 12 months to aid inmates in their return to society. Id. Therefore, these cases find nothing fundamentally offensive about these agency policy preferences, provided that each inmate receives the individualized consideration of this RRC placement called for by the Act. Id.

Two cases take a different view. Krueger v. Martinez, 665 F.Supp.2d. 477 (M.D. Pa. 2009); Strong v. Schultz, 599 F.Supp.2d 556 (D.N.J. 2009). In Strong and Krueger, the district courts found that: (1) the agency requirement of prior regional director approval for 12-month RCC placements; coupled with (2) the agency's stated position that "inmates' pre-release RRC needs can usually be accommodated by a placement of six months or less", so restrict inmate access to the 12-month RRC programs permitted under the Second Chance Act that they constitute an abuse of discretion by the Bureau of Prisons. Id. In Krueger, the district court also went on to note another shortcoming in the agency's implementation of the Act, observing that in making its particular RRC placement the agency appeared to have failed to

consider a statutory requirement under 42 U.S.C. § 17541 that the Bureau of Prisons use early RRC placements to create incentives for inmates to participate in educational programs. Krueger, 665 F.Supp.2d. at 484-86 . Citing these concerns, these two courts granted habeas petitions, but only permitted a very limited form of relief, directing the agency simply to reexamine its decision without taking into consideration the general agency policy guidance which the courts found to violate the goals of the Act.

While these two cases express this view with great force, it is recommended that the Court adopt the majority view in terms of its framework for analysis of this habeas petition. At the outset, imposing this heightened scrutiny to these prison placement decisions can create a legal and analytical dilemma for reviewing courts in terms of defining the proper scope of judicial review in an area committed to agency discretion. This dilemma is aptly described by the one of the leading decisions in this field, Miller v. Whitehead, supra, which succinctly identified the dangers which may arise if agency determinations regarding how to implement statutes concerning inmate prison assignments which provide for the exercise of substantial discretion are not given due deference. As the Court noted:

> Taken to its logical conclusion, the argument advanced by the inmates would require the BOP to consider daily requests for transfer to an RRC from every inmate in a facility, and to deny such requests only after an individualized consideration of each inmate's request and the five statutory factors. We agree . . . that "Congress surely did not intend such

a result." See Muniz v. Sabol, 517 F.3d 29, 36 n. 14 (1st Cir.2008). "Even if a statutory scheme requires individualized determinations, ... the decisionmaker has authority to rely on rulemaking to resolve certain issues of general applicability unless Congress clearly expresses an intent to withhold that authority." Lopez v. Davis, 531 U.S. 230, 243-44(2001) (internal quotation omitted).

Miller, 527 F.3d at 757.

These dangers may not have been fully addressed by those two cases which have granted habeas relief, since neither court discussed Miller, the leading appellate court decision in this field, in reaching their conclusions.

Furthermore, we agree with the majority of courts which have considered this statutory text, that the Second Chance Act does not appear to have the type of legal force that Strong and Krueger suggest. While the Act authorizes 12-month RRC placements by the Bureau of Prisons, it does not mandate them. Instead, the Act expressly and repeatedly emphasizes that the Bureau of Prisons retains full discretion in identifying when and how inmates are placed at RRCs. See, e.g., 18 U.S.C. §§ 3621(b), 2624(c)(1) and (4); 42 U.S.C. §§ 17541(a)(2) and (g)(5).

Moreover, while we recognize the force of institutional inertia, and the fact that these policy prescriptions will restrict the number of inmates who receive this 12-month program, any exercise of discretion yields this result for some inmates, yet Congress expressly authorized the exercise of this discretion by the Bureau of Prisons

when implementing this program. See, e.g., 18 U.S.C. §§ 3621(b), 2624(c)(1) and (4); 42 U.S.C. §§ 17541(a)(2) and (g)(5). Furthermore, the requirement of regional director approval for 12-month placements in RRCs and limiting extended access to these programs is rationally related to one of the statutory factors which govern prison placements; namely, the allocation of limited available prison resources. See 18 U.S.C. 3621(b). Without centralized coordination of these placements, individual institutions applying guidance in different ways could quickly exhaust available inmate housing. Thus, the various competing demands for these placements is a factor which strongly cautions in favor of some centralized assessment of extended RCC placement requests.

Finally, while we agree with the Miller court that individualized assessments of specific RRC placement decisions is not a task well-suited for the courts, we also note that the broader question of the Bureau of Prisons' overall implementation of its discretion under the Second Chance Act is also an issue which is more appropriately considered in some other forum. In that regard, the Act expressly calls for legislative oversight of this process, mandating that the Bureau of Prisons prepare and submit to Congress annual reports documenting the way in which it exercises the discretion conferred upon it by Congress in this field. See 42 U.S.C. § 17541(d). While this Congressional oversight is not a reason to forego our responsibilities here, it is a factor

which suggests that in fulfilling our responsibility we should focus on ensuring that each inmate receives the individualized consideration called for by the law, and we may leave the broader public policy assessment of how well prison policies meet Congressional expectations to another forum.

In short, adopting a view which calls for a particularized analysis and assessment of the wisdom Bureau of Prisons' policy guidance in the area of RRC placements could draw the courts into an individualized assessment of each inmate's case against the five statutory factors, a result we do not believe that Congress intended. Miller, 527 F.3d at 757. Moreover, many of these policies, and particularly the policy requiring centralized review of extended RRC placements, are rationally related to institutional needs that are expressly delegated to the Bureau of Prisons. Further, to the extent that there is a need to engage in an overall assessment of how these policies are being implemented, the Second Chance Act clearly contemplates that this review will be done primarily through Congressional oversight. Therefore, all of these statutory considerations weigh in favor of the majority view expressed by the federal courts, which calls upon the courts to limit judicial review in this field to making an independent assessment that the Bureau of Prisons engaged in an individualized determination of each inmate's placement, using the statutory factors

set forth in the law. <u>Smith v. Sanders</u>, No. 09-3083, 2009 U.S. Dist. LEXIS 82265 (C.D. Cal. July 31, 2009).

Adopting this standard of review, we believe that the record of these proceedings shows that Ramos' request received individualized consideration at the prison. For example, on January 29, 2010, a recommendation for 150 to 180 days RRC placement was submitted for the Warden's approval. (<u>Id</u>. ¶ 9; Inmate Skills Development Plan, Attach. 6). The recommended time frame was based on the five statutory factors contained in 18 U.S.C. § 3621, and reflected that these five factors had been applied specifically to the personal circumstances presented in Ramos' case, since the notification referred to Ramos' personal history, past drug use, and current family situation. (<u>Id</u>.; Institutional Referral for CCC Placement, Attach. 5 to Ex. 1). In particular, this recommendation was based on the fact that Ramos has secured residency with his wife, that Ramos was not destitute, that Ramos had a GED, and had employment skills as well as fluency in two languages. (<u>Id</u>.; Inmate Skills Development Plan, Attach. 6). The RRC placement decision also set individually tailored goals for Ramos, stating that Ramos' primary objectives while housed at the RRC should be the need to secure employment and to reconnect with his family.( <u>Id</u>. ¶ 10; Inmate Skills Development Plan, Attach. 6).

But even if the Court embraced the more heightened standard of review adopted in <u>Krueger v. Martinez</u>, 665 F.Supp.2d. 477 (M.D. Pa. 2009), this particular placement decision would still appear to meet the requirements set by law. At the outset, it is evident that this decision involved a specifically tailored, and individualized assessment of the needs of Ramos, an assessment that was thoroughly documented by prison officials at the institution. Therefore, regardless of the standard of review employed here, an assessment of the RRC placement decision in this case leads to the firm conviction that this decision represented an individualized assessment of the needs of this prisoner, which is all that the law requires, and all that an inmate can demand.

While we reach this result in this particular case, we note that prison officials have agreed that they : "<u>must</u> approach every individual inmate's assessment with the understanding that he/she is now <u>eligible</u> for a maximum of 12 months pre-release RRC placement," (Doc. 5, Ex. 1, attach. 1, emphasis in original). We urge prison officials to remain mindful of the standards which they have set for themselves, and which Congress has set for them, as they ensure that all inmates understand that they are receiving an individualized assessment of their needs.

# IV. **Recommendation**

Accordingly, for the foregoing reasons, upon consideration of this Petition for Writ of Habeas Corpus filed pursuant to 28, United States Code, § 2241, IT IS RECOMMENDED that the Petition be DENIED, and that a certificate of appealability should not issue. The Petitioner is further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified  proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

*S/Martin C.  Carlson*
Martin C. Carlson
United States Magistrate Judge

Dated: May 5, 2010